UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * **Criminal No. 24-cr-171-BAH** |
| v. | * |
| | * |
| **JAMES STYNER** | * |
| | * |

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING**

COMES NOW, the defendant, James Styner, through counsel, and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("Sentencing Guidelines" or "Guidelines"), respectfully submits to this Honorable Court his position with respect to sentencing. For the reasons set out below, James Styner respectfully asks the Court to vary downward from the Guidelines and sentence Mr. Styner to a period of 120 months of incarceration as to Count 1 and to concurrent terms of 60 months as to Counts 2-5, to be followed by concurrent terms of five years of supervised release, with conditions, as a sufficient but not greater than necessary sentence.

In further support of his position, Mr. Styner, through counsel, offers the following:

**Response to Presentence Investigation Report**

Mr. Styner has no objections to the content of the Presentence Investigation Report ("PSR"), including the calculation of the Sentencing Guidelines. *See* ECF 47. Mr. Styner appreciates probation's recommendation that the Court vary downward from the Guidelines, *See* ECF 48 at 2 (recommending 204 months), while contending that a sentence of seventeen years of incarceration is more than necessary. Mr. Styner disagrees

1

with the recommendation of probation for a 25-year term of supervised release. *Id.* Mr. Styner will be a full-fledged adult, a very different person, when he is released from prison well into the future, and a (concurrent) 5-year term of supervised release is sufficient and no greater than necessary.

Finally, Mr. Styner appreciates that the PSR quotes Dr. Sara Boyd's Clinical Evaluation at length in the body of the PSR. Mr. Styner attaches the report to this Sentencing Memorandum as Exhibit 2 (sealed), and respectfully asks the Court to order that Dr. Boyd's report is attached to the PSR such that it is sent to the U.S. Bureau of Prisons ("BOP") as part of the PSR for BOP's use in determining classification and programming.

## Sentencing Factors Under § 3553(a)

Mr. Styner was only seventeen years old when the conduct arose, and the charges address conduct shortly after he turned eighteen. In many ways, his psychological makeup and his life created a perfect storm for him to meet other young people on the internet, adopt and speak to others in the language of a boy who learned communication style from other boys on the internet, and act immaturely, inappropriately, and illegally with girls younger than his own ages of 17 and 18 whom he met online. For his conduct, he was arrested in California, transported across the country, and detained at the D.C. Jail with older inmates with records and charges of crimes involving weapons and violence.

Mr. Styner will come before this Court to learn what serious punishment his conduct draws. He knows that he is going to federal prison for a very long time – for a time that will take him through his twenties into full-fledged adulthood. Because of his actions, his lifepath is seriously changed from that he might have hoped for. Nonetheless,

as shown by his exemplary conduct at the D.C. Jail and the letters of those who know him best, Mr. Styner is a young man of promise who will come out of the tunnel of the criminal legal system, supported by his family and friends, a better, law-abiding person who will never again engage in these types of actions.

**Mr. Styner Background and Personal Circumstances During Time of Offense**

James Styner is a young man who in many ways seems to have grown up in a typical fashion. He was raised in a two-parent home. His parents worked. They loved and love him. They provided for their son. Yet Mr. Styner also suffered deficits that challenged and debilitated him.

Even as a child, Mr. Styner was behind developmentally. He continued to use a pacifier until the age of four and slept in his parents' bed until he was six years old. In first grade, when the teacher reported he had trouble sitting down in the classroom, his parents took Mr. Styner for an evaluation, at which he was diagnosed with ADHD. Later, they advocated for and obtained a § 504 educational services plan for Mr. Styner. His parents observed evidence of autism as he grew up, but they also thought that he seemed to be progressing adequately through school. Rather than stigmatize him with a then-diagnosis of Asperger's Syndrome or autism spectrum, they relied upon some modest therapy when he was in the sixth grade and services within the schools, together with their love, to help him develop as he became older.

When Mr. Styner presented differently – like socially awkward or challenged – his parents tried to compensate. His dad enrolled him in Cub Scouts and Boy Scouts, for example, to socialize him and give him a sense of working with others. Mr. Styner did not love scouting, but his parents saw it as valuable for him. His parents failed to

3

recognize that his social isolation was more than a phase, it was symptomatic of and progressively compounding a serious developmental impediment. By ninth grade, Mr. Styner was chronically online – gaming and online messaging. The physical distance of online interaction fit his personality and comfort level around others, while unknowingly removing him from pro-social interactions and experiences.

In high school, during free time outside mandatory classroom attendance, Mr. Styner was often by himself, including at the lunch table and in the computer lab. After coronavirus hit the country and shuttered schools and public spaces, Mr. Styner spent almost all his time on the computer – mostly on Discord but other unmonitored platforms as well. Like so many children, he was home all the time, on his computer. His parents thought that was a good thing in many ways. He was with them, safe, where he could not get hurt or in trouble. They thought they could monitor his virtual learning. But they were not aware of the dangers of the internet, of its deep toxicity, and how regular access by teenaged boys shaped and warped the perspectives of those boys as to the world – including gender dynamics and roles. Teenaged boys like Mr. Styner who had never had a girlfriend and had never even had a meaningful potential romance, learned how to talk – and in many ways – *how to think* from the ugly views of others on the internet.

Meanwhile, Mr. Styner was unlike other teenaged boys. He was neurologically, mentally, and socially atypical. At the age of thirteen, he attempted suicide. Undergirding his development, he suffered from autism, undiagnosed, untreated, and, thus, unsupported with the challenges associated with that serious neurodivergence. Shortly before the events here, Mr. Styner stopped self-administering his ADHD medicine, with his parents' knowledge and approval since he was home during the day and did not seem to need it to

get through active, in-person class time. This de-medication undermined his daily mental state and decision-making. At the same time, he was growing ostracized from his local peers. Mr. Styner's parents reported to the local police online bullying that Mr. Styner received on Instagram. Even scouting had moved to online. Mr. Styner stopped seeing peers in person, or "IRL" (in real life). His waking life was spent amidst the maladaptation and toxicity of online gaming and interaction, and he was without the tools to identify the guiderails to manage that experience and existence.

Mr. Styner's social isolation and undiagnosed autism meant his chronological age greatly exceeded his social and mental ages. He was seventeen – and then eighteen – when talking with the girls on internet platforms whom he viewed as peers. They too were teenagers.[1] "Emotionally and developmentally, he appears to *function more like a younger teenager than an older adolescent*." Exhibit 2 at 1 (emphasis added). For Mr. Styner, socially, they were close in age to him. Of course, they were younger teenagers and adolescents, and immature. Their apparent agreement to interacting with him was conditioned by their ages and immaturity. His interaction with them was also affected by his immaturity and cognitive limitations.

It is correct that Mr. Styner sometimes verbalized cruel and abusive language – what he heard, saw, and learned from others in the cesspool of Discord and online communities. Counsel sees that language too frequently online in his cases with juvenile clients and with the teenagers and their associates in his own personal life. Mr. Styner met up with and had IRL relationships with two of the girls. Of those, MV9, who had originally identified herself as eighteen years old before correctly amending her age to

---

[1] One girl was 12, turning 13. All the other girls were teenagers, about half were 15-16 years old.

5

him as fifteen years old, is an open state statutory rape case in California, with "a non-extraditable arrest warrant" pending. ECF 47 at 22, ¶ 97. While he used harsh language with MV9 about her pregnancy, he also "withdrew his suggestion about an abortion and noted it was MV9's decision and they would talk about it when he arrived." *Id.* He "texted that he was on the way to her residence." *Id.* Even after Mr. Styner was arrested, MV9 initiated and remained in contact with him, letting him know about her pregnancy, stating she did not think he wanted to hurt her, and wishing him well. Mr. Styner faces additional state prison time for that statutory rape incident.

There are also mitigating factors in Mr. Styner's conduct. He talked about who he was, his true age – and that he was acting for himself, alone. This is not a CP case in which the defendant is a grown man, or hiding his identity, acting in concert with others to share images with other men or to spread images worldwide, or engaging with children for some commercial purposes. He is not a pedophile. *See* Exhibit 2 at 9 ("The available information is not supportive of a Pedophilic Disorder diagnosis at this time, as Mr. Styner's focus appears to have been on post-pubescent adolescent girls rather than prepubescent children."). This was a neurologically impaired teenager using the internet in inappropriate, if too commonplace, ways to try to make romantic and sexual connections with girls who showed mutual interest in him and with whom he thought could be romantic partners. The open California case concerns someone in which each young person perceived a boyfriend-girlfriend relationship. Mr. Styner's behavior was wrong and illegal. He admits as much. But as Dr. Boyd's report shows, it was also psychologically understandable.

Mr. Styner has been detained since October 2023 and has spent well over a year at the D.C. Jail. Even in the time since he returned to this jurisdiction, and with the limited developmental services at the Jail, Mr. Styner has already matured dramatically – as one commonly sees with someone from the ages of 18 to 20. His adolescent brain is not yet fully developed, and his decision-making and judgment will continue to markedly improve as he ages into his twenties and then his late twenties. *See* Exhibit 2 at 9 ("His poor judgment is likely to improve with age."). While Mr. Styner may not have understood the full gravity of his misconduct at the time he was talking with – and sometimes meeting – the girls in 2022 and 2023, he appreciates it fully now. He knows what he did was wrong. He is embarrassed, ashamed, mortified, apologetic, remorseful, and resolved that whenever he gets out of prison, he will only attempt to have relationships with people of his own adult-phase age and that he will act and speak differently (better) in those relationships. Mr. Styner hand-signed a letter to the probation officer, which is included in the PSR. *See* ECF 47 at 16, ¶ 51 ("I am very sorry for what I did. I should not have been talking with high school girls and young girls. I should not have asked them to send me nude videos + videos that showed sex acts and I should not have met up + had sex with anyone under the age of 18. Before all this, I had never had sex before. That doesn't matter. I should have done better – especially after I graduated high school and turned 18. I am sorry for how I hurt each of the girls.").

Mr. Styner also hand-wrote a letter to this Court, which is attached as Exhibit 3. In it, he wrote, in part: "I sincerely apologize for my actions. I understand the severity of what I have done. I should have realized what I was doing was wrong to those online and in person. I'd like to give my condolences to the girls who's [sic] lives I've forever

7

changed because of my inability to realize the consequences of my heinous actions." *Id.* Mr. Styner also reported that his arrest and experiences and time at the Jail have helped him learn so that he will not commit the crimes again: "Since going to jail, I have had a lot of time to think and reflect upon my actions. I will never do this again. I will get the help necessary to make sure this doesn't happen again." *Id.* He ends, "I'm truly sorry to the victims and my family. I regret all of the harm I caused. I hope to do better with my life." *Id.*

Many persons who come to sentencing say that they are contrite and will change their ways. By counsel's estimation, James Styner really is and really does plan to do so. He knows that all he can do is make the best of his situation and be a better person than how he acted to lead himself to imprisonment. Inside the Jail, he was given the trusted job of Detail, where he works to clean and paint the unit. He has not had a single write-up. He is not a future danger to anyone – whether teenaged girls, adult women, or anyone. As safely as can be afforded to him given his charges, his appearance, and his mannerisms with the adult prison system, Mr. Styner will serve his time and eventually return to the community as an adult man, to work, striving to have good personal relationships that might result in marriage, home, and family, as he builds a life with full respect for other people and the requirements of the law.

Together with this memorandum, the defense submits many exhibits. The first, Exhibit 1, is a collection of photographs of Mr. Styner. Exhibit 2 is Dr. Boyd's evaluation. Counsel knows the Court will read her evaluation carefully and therefore does not reiterate and quote it here. Exhibits 4 and 5 are detailed letters from his parents. Exhibits 6 through 11 are letters from aunts, uncles, and other relatives. Exhibits 12

8

through 14 are letters from long-time, adult family friends (who acted in an aunt/uncle-type relationships). Exhibits 15 and 16 are letters from Mr. Styner's two closest friends and peers, with whom he continues to regularly and frequently speak to on the telephone even while incarcerated. Exhibit 17 is a letter from his middle school tutor. Exhibits 18 through 20 are letters from adults who know Mr. Styner from his time as a Boy Scout. Counsel asks the Court to pay particular attention to Exhibit 20, which relates tremendous insight into Mr. Styner's character.

The letters give a true sense of Mr. Styner. Counsel frequently quotes representative statements in letters in his sentencing memo but will forgo doing so here given full knowledge that the Court will read every letter in detail. To summarize, they reflect that Mr. Styner was a socially immature young man. He liked Dungeons and Dragons, Legos, and manga anime. He participated in online gaming. He interacted more with peers on the internet that he did in real life. He also was polite and kind. He helped older neighbors. While largely socially isolated from others, he had a good friend in high school, and made a good friend in community college. Each of those young men remain his friends today, talking with him regularly on the phone. He worked hard as a Cub/Boy Scout, achieving the rank of Eagle Scout. His time as a Boy Scout was still somewhat solitary, but it gave him purpose and showed his ability to succeed.

Mr. Styner takes responsibility for his actions. He also feels deep remorse. Looking back, he readily sees how his behavior was wrong and how it was harmful, and he feels genuine contrition about his conduct and its consequences. He is only twenty years old. Instead of finishing college as his parents had dreamed, he will go to prison for many years. The government asks for a sentence that is as long as he has been alive. A

sentence of imprisonment of 120 months is sufficient and no greater than necessary. Looking back, ten years ago, he was in the fourth grade. Ten years from now, Mr. Styner will be 30. He will have spent over one third of his life in prison because of offenses he committed at the age of 18. His entire young adulthood – the years he might otherwise go to college, make new friends, learn to live independently, and start his adult life – will be gone. When Mr. Styner is released, his options will be limited. A sentence of a full decade in prison is severe and it is sufficient.

### First Step Act Consideration

In fashioning its sentence, Mr. Styner respectfully asks the Court to take into consideration the application of the First Step Act and Congress' providing opportunities for Mr. Styner to take classes and coursework while serving his sentence in the Bureau of Prisons to earn the opportunity for credits that reduce his overall sentence.

For Count 1, Coercion and Enticement of a Minor, Mr. Styner is subject to a mandatory minimum sentence of 10 years in prison. Counts 2-5, for Distribution and Receipt of Child Pornography, have mandatory prison sentences of five years in prison, which can be concurrent with each other and concurrent with Count 1.

Under the First Step Act, Mr. Styner can earn First Step Act credits to reduce his sentence greater than the standard 15% for his sentence under § 2422(b) for the Coercion and Enticement offense in Count 1. He *cannot* earn First Step Act credits for any his sentences under § 2252(a) in Counts 2-5.

Mr. Styner committed his offenses at the age of 18 years old. He remains but 20. He has much time to mature and to grow. He will benefit from the opportunity to earn

10

First Step Act credits, plus the opportunity to advocate for inclusion in those classes will incentivize him while he is serving his prison sentence.

Mr. Styner therefore asks the Court to sentence him to the mandatory minimum sentence of 10 years of incarceration as to Count 1 and to concurrent mandatory minimum sentences of 5 years as to each of Counts 2-5. If the Court concludes that he should serve a cumulative sentence greater than 10 years, Mr. Styner asks the Court to increase the sentence only as to Count 1, which will be subject to the First Step Act, and to continue to give concurrent sentences of 5 years as to each of Counts 2-5. If credits are offered and earned by Mr. Styner, BOP will then apply any First Step Act credits to the full length of the prison term imposed by the Court, such that he might earn a sentence that Congress has deemed appropriate for the offenses. *See* 18 U.S.C. § 3632(d)(40)(D)(xlii).

**Requests for Recommendations by the Court to the U.S. Bureau of Prisons**

Counsel has reviewed the appropriate and the most likely BOP classification of Mr. Styner based upon his PSR. Counsel evaluates that Mr. Styner should be classified as "LOW" security by the BOP. Low security is not "MIMIMUM" (camp) security. Low-security prisons are secure locations with security protocols far more rigorous than camps.

Counsel's computation suggests that:

- Offense should be rated HIGH = 5 points
- Age (20) = 8 points
- No drug abuse history
- He has a high school diploma

11

- No criminal history

- Not permitted to self-surrender

Total of 13 points. 12 to 15 security points render him LOW security. In addition, a management variable (termed a Public Safety Factor or "PSF") of Sex Offense requires at least LOW security level. Therefore, via both his classification points and the PSF, Mr. Styner is classified as LOW.

But there is a significant qualifier. BOP will view the pending state statutory rape charge noted in ¶ 97 of the PSR as "rape", a Greatest Severity office. As a result, the BOP's Designation Center analysis classifying Mr. Styner will add 7 points under the "detainer." That will raise Mr. Styner's security point total to 20 points. 16-23 points is Medium. Medium security prisons in the BOP system normally house inmates with more than twenty years to serve. These inmates are some of the most serious offenders in the system, many of whom are violent, gang-affiliated persons who inherently despise sex offenders. In short, many torment such offenders. And the most likely facility that Mr. Styner would be sent is Victorville FCI, which is a dangerous place for any inmate but particularly one with Mr. Styner's charge and his background, physical stature, and developmental disabilities and personality.

Counsel therefore asks the Court for the following judicial recommendation for designation to the BOP:

> "The Court is mindful this young defendant, based mostly on the fact he has a pending case (sex with a minor) at age 18, likely will be classified Medium Security. The Court is desirous of keeping this young defendant safe. Therefore, the Court recommends the Bureau of Prisons, depending

on their classification assessment, apply a Lesser Security management variable to allow for the defendant's designation to a low-security institution. The Court specially recommends FCI Terminal Island to facilitate family visitation."

### Credit for Time Served

Mr. Styner asks that the Sentencing Order reflects that Mr. Styner is to receive credit for time-served since his arrest on October 26, 2023. *See* ECF 47 at 2.

### The Mandatory Minimum is an Appropriate Sentence

Counsel presents present Mr. Styner as the precise use-case for a mandatory minimum sentence. His charges are severe, and he does not contest his actions deserve consequences. However, his case presents a set of circumstances that explain his charges to the maximum extent possible. First, Mr. Styner committed the acts at the age of 18, making him the least offensive age possible for someone charged with these actions. Second, Mr. Styner has a neurological condition that both impaired his decision-making and explained his connection to teenagers below his age. Third, Mr. Styner presents almost zero risk of reoffending. He has never connected with or had any desire to connect with the adult community who engage in the conduct with which he is charged. Upon his release at age 30, it is extremely probable that Mr. Styner will be chastened, transformed, and ready to contribute to society. In this light, counsel urges the Court to allow the minimum sentence to serve its purpose in providing a bright line representing adequate consequences for the least-offensive offenders.

**Conclusion**

WHEREFORE, for the foregoing reasons, and any others that may appear to the court or that may develop at the sentencing hearing, James Styner, through counsel, respectfully requests that this Honorable Court vary downward and sentence him to a term of imprisonment of 120 months as to Count 1 and to concurrent terms of 60 months as to Counts 2-5, with concurrent terms of five years of supervised release.[2] This punishment is sufficient but no greater than necessary to provide adequate deterrence, to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offenses.

Respectfully submitted,

Date: June 15, 2025

/s/ Edward J. Ungvarsky
Edward J. Ungvarsky
# 459034
Ungvarsky Law, PLLC
421 King Street, Suite 505
Alexandria, VA 22314
DC: 202-546-1500
VA: 571-207-9710
Cell: 202-409-2084
Fax: 571-777-9933
ed@ungvarskylaw.com
Local Counsel for Defendant

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that, this 15th day of June, 2025, I caused a copy of the foregoing motion to be served on counsel of record via the District Court's Electronic Case Filing system.

/s/ Edward J. Ungvarsky
Edward J. Ungvarsky

---

[2] Mr. Styner is also required to submit a DNA sample and to be registered as a Sex Offender.

14